**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MICHAEL FUHRMAN, Derivatively on Behalf of CLOVER HEALTH INVESTMENTS, CORP., | Case No.: |
| Plaintiff, | |
| vs. | **JURY DEMANDED** |
| VIVEK GARIPALLI, ANDREW TOY, CHELSEA CLINTON, NATHANIEL S. TURNER, and LEE SHAPIRO, | |
| Defendants, | |
| -and- | |
| CLOVER HEALTH INVESTMENTS, CORP., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Michael Fuhrman ("Plaintiff") by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Clover Health Investments, Corp. ("Clover" or the "Company") (formerly known as Social Capital Hedosophia Holdings Corp. III ("SCH")), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Clover with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable

opportunity for discovery.

## NATURE OF THE ACTTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Clover, against certain of its officers and/or directors named as defendants herein seeking to remedy Defendants (defined below) violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from October 6, 2020 to the present (the "Relevant Period").  Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to Clover, including damages to its reputation and goodwill.

2.      On October 6, 2020, the Company issued a press release announcing plans to become a publicly traded company via a merger with SCH.  SCH was setup as a special purpose acquisition company (also known as a SPAC). SCH's shares traded on the New York Stock Exchange under the ticker symbol "IPOC."  The Company's October 6, 2020 release provided, in relevant part, that the transaction valued the Company at an enterprise value of approximately $3.7 billion, and the transaction was expected to deliver up to $1.2 billion in gross proceeds.

3.      On January 7, 2021, the Company and SCH announced that their anticipated business combination had been completed and shares of Clover would begin trading on NASDAQ under the ticker symbol CLOV the next day.

4.      On February 4, 2021, analyst *Hindenburg Research* issued a report entitled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation."  In this report, *Hindenburg Research* "reveal[ed] how Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of the Company's business in the run-up to the company's SPAC go-public transaction

last month." *Hindenburg Research* stated that its investigation "spanned almost 4 months and has included more than a dozen interviews with former employees, competitors, and industry experts," as well "dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials."

5.      Hindenburg Research continued: "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained."  Hindenburg Research further wrote that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor. Our research indicates that the investigation has merit."

6.      On this news, shares of the Company stock plummeted from their February 3, 2021 closing price of $13.95 per share to just $12.23 per share on February 4, 2021, representing a one day drop of approximately 12.3%.  This represents a loss of approximately $700 million in market capitalization. Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021.

7.      Throughout the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was the recipient of a Civil Investigative Demand from the DOJ; (ii) much of the Company's sales are driven by a major related party deal that Clover not only failed to disclose but took active steps to conceal; (iii) the Company's subsidiary Seek Insurance failed to disclose its relationship with the Company and misled consumers as to its purported independence; (iv) the Company's software was in fact rudimentary; and (v) as a result, the Company's public statements were materially false and misleading at all

relevant times.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).  Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions (defined below) based on violations of the Exchange Act.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because Clover's By-laws state:

> Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if and only if the Court of Chancery of the State of Delaware lacks subject matter jurisdiction, any state court located within the State of Delaware or, if and only if all such state courts lack subject matter jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for the following types of actions or proceedings under Delaware statutory or common law: (i) any derivative action or proceeding brought on behalf of the Corporation; (ii) any action or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer or other employee of the Corporation or any stockholder to the Corporation or the Corporation's stockholders; (iii) any action or proceeding asserting a claim against the Corporation or any current or former director, officer or other employee of the Corporation or any stockholder in such stockholder's capacity as such arising out of or pursuant to any provision of the General Corporation Law, this Certificate or the Bylaws of the Corporation (as each may be amended from time to time); (iv) any action or proceeding to interpret, apply, enforce or determine the validity of this Certificate or the Bylaws of the Corporation (including any right, obligation or remedy thereunder); (v) any action or proceeding

as to which the General Corporation Law confers jurisdiction to the Court of Chancery of the State of Delaware; and (vi) any action asserting a claim against the Corporation or any director, officer or other employee of the Corporation or any stockholder, governed by the internal affairs doctrine, in all cases to the fullest extent permitted by law and subject to the court's having personal jurisdiction over the indispensable parties named as defendants. This Article X shall not apply to suits brought to enforce a duty or liability created by the Securities Act of 1933, as amended, or the Exchange Act, or any other claim for which the federal courts have exclusive jurisdiction.

## PARTIES

### Plaintiff

11.    ***Plaintiff Michael Fuhrman*** ("Plaintiff") acquired Clover securities and will continue to hold Clover shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

12.    ***Nominal Defendant Clover*** purports to be a Medicare Advantage insurer that uses its software platform, the Clover Assistant, to provide America's seniors with PPO and HMO insurance plans.  The Company's headquarters are located at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067, and the Company is incorporated under the laws of the State of Delaware.

### Director Defendants

13.    ***Defendant Vivek Garipalli*** ("Garipalli") is a co-founded Clover and has served as Clover's Chief Executive Officer ("CEO") and as a member of the Board of Directors ("Board") since July 2014.  Defendant Garipalli also served as the Company's President from July 2014 to March 2019.  Defendant Garipalli is a member of the Audit Committee.

14.    ***Defendant Andrew Toy*** ("Toy") has served as the Company's President since March 2019, as Chief Technology Officer ("CTO") since February 2018 and as a member of the Company's Board since November 2018.

15.     **Defendant Chelsea Clinton** ("Clinton") has served as a member of the Company's Board since February 2017.  Defendant Clinton is a member of the Nominating and Corporate Governance Committee and the Chair of the Talent and Compensation Committee.

16.     **Defendant Nathaniel S. Turner** ("Turner") has served as a member of the Company's Board since April 2015.  Defendant Turner is a member of the Audit Committee and a member of the Talent and Compensation Committee.

17.     **Defendant Lee A. Shapiro** ("Shapiro") has served as a member of the Company's Board since January 2021.  Defendant Shapiro is the Chair of the Audit Committee and the Nominating and Corporate Governance Committee.

18.     Defendants Garipalli, Toy, Clinton, Turner and Shapiro are herein referred to as "Director Defendants."

19.     **Defendant Chamath Palihapitiya** ("Palihapitiya") has served as SCH's CEO and Chairman of SCH's Board of Directors since October 2019.  Since the January 7, 2021 business combination, Defendant Palihapitiya has acted as a senior advisor to Clover's management.

20.     The Director Defendants and Defendant Palihapitiya are collectively referred to herein as "Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

21.     As members of Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

22.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Clover, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that

the Director Defendants were aware posed a risk of serious injury to the Company

## DUTIES OF THE DIRECTOR DEFENDANTS

23.     By reason of their positions as officers, directors, and/or fiduciaries of Clover and because of their ability to control the business and corporate affairs of Clover, the Director Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Clover in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of Clover and its shareholders.

24.     Each director and officer of the Company owes to Clover and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

25.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Clover, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Clover, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Clover.

26.     To discharge their duties, the officers and directors of Clover were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Clover were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how Clover conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

27.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Clover, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

28.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action (and related lawsuits).  As a result, Clover has expended, and will continue to expend, significant sums of money.

29.     The Director Defendants' actions have irreparably damaged Clover's corporate image and goodwill.

## THE FALSE AND MISLEADING STATEMENTS

30.     On October 6, 2020, the Company and SCH announced their plan to enter into a merger through which Clover would become a publicly traded company.

31.     The Company described itself in this October 6, 2020 press release as "a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses.  A unique

model in health insurance, Clover partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care."

32.     The proposed merger valued the Company at $3.7 billion and noted that the Company was expected to receive up to $728 million of transaction proceeds and that up to $500 million of cash proceeds were expected to be allocated to existing Clover shareholders.

33.     In this October 6, 2020 press release, the Company and SCH further provided:

Technology is at the core of Clover's business – the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software to assist physicians with clinical decision-making at the point of care. Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes.

The Clover Assistant enables a virtuous growth cycle, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. In turn, the Company believes its best-in class plans will continue to deliver market-leading growth, allowing the Clover Assistant to capture and synthesize more data and ultimately drive better care.

* * *

Today, Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach, Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare eligible in eight Georgia counties.

Clover's management team, led by CEO and Co-Founder Vivek Garipalli and President and Co-Founder Andrew Toy, will continue to lead Clover following the transaction. Chamath Palihapitiya, Founder and CEO of SCH, will act as a senior advisor to the Company's management.

34.     In this October 6, 2020 press release, Defendant Toy stated:

"I believe that more and more doctors are embracing the Clover Assistant because it allows them to focus on what they want to do, which is to look after patients. Importantly, the platform is empowered by a closed feedback loop, linking clinical data and physician action, which improves continuously as membership grows, allowing us to constantly evolve new ways of helping physicians and their patients."

35.     Also, on October 6, 2020, SCH and the Company filed the Agreement and Plan of Merger as an Exhibit to a Form 425 Prospectus with the SEC.  Section 4.30(a) ("Healthcare Compliance") of this Agreement and Plan of Merger provided that "[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program . . . ."

36.     Elsewhere in the Agreement and Plan of Merger, "Health Care Laws" is defined to include, *inter alia*, the Federal False Claims Act, the Federal Anti-Kickback Law, and many other related laws.

37.     Section 4.30(d) of the Agreement and Plan of Merger provided that "[s]ince January 1, 2018 . . . (iii) each of [Clover] and its Subsidiaries has implemented and maintained a compliance program, including policies, procedures and training, intended to ensure compliance with all applicable Health Care Laws . . . ."

38.     On October 6, 2020, Defendant Palihapitiya appeared on *CNBC* in an interview announcing the Clover-SCH transaction.

39.     Defendant Palihapitiya stated that Clover was not engaged in the practice of "upcoding," or inputting inaccurate medical information to increase reimbursement from

government payors such as Medicare.  Defendant Palihapitiya also stated: "They [the Company] create transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid."

40.     Defendant Palihapitiya also stated during this interview that SCH was "really excited after months of diligence and work to announce [the] merger between IPOC and Clover Health to take Clover Health public."

41.     On October 20, 2020, SCH filed a Form S-4 Registration Statement with the SEC. In this document, SCH and the Company represented that they had discussed "typical due diligence," and that "[f]rom August 25, 2020 to August 28, 2020," SCH, the Company, and their legal representatives "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business."  This document further provided that on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover."  The document further provided that representatives of SCH and Clover met several other times to discuss, *inter alia*, due diligence review and matters associated therewith.

42.     This October 20, 2020 Form S-4 Registration Statement further provided that, in reaching its recommendation to pursue the business combination with Clover, its board:

> [C]onsidered the scope of the due diligence conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to Clover, including: (a) extensive virtual meetings and calls with Clover's management team regarding its operations, projections and the proposed transaction; and (b) review of materials related to Clover and its business, made available by Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

43.     In the October 20, 2020 Form S-4 Registration Statement, the Company also represented that "[w]e work diligently to ensure compliance with all applicable laws and regulations."  The Company repeated this same sentence in several other public SEC filings during the Relevant Period, including in at least the January 13, 2021 Form S-1 Registration Statement and the January 29, 2021 Form 424B3 Prospectus.

44.     On November 19, 2020, SCH filed a presentation with the SEC entitled "Clover Health: A Deeper Dive." This presentation lauded Clover's "Virtuous Growth Cycle." The presentation further asserted that "Physicians Value the Clover Assistant," and that "[i]n ~2 years since product launch, we've built a broad base of engaged physicians.  Given our software-driven approach, we believe we can scale these results rapidly within existing and new markets."  In this presentation, the Company further stated that physicians were "[i]ncentivized to use [Clover's] highly delightful tech platform . . . that suggests personalized care recommendations at the point of care" and that the platform was "[d]esigned to work with any PCP and remove financial concerns from clinical decision-making."

45.     On January 6, 2021, SCH announced that its shareholders voted to approve of the proposed business combination with Clover, and that the transaction was expected to close the next day.

46.     On January 7, 2021, Clover and SCH announced the completion of the business combination.

47.     Defendant Garipalli stated in the January 7, 2021 release: "[a]s a public company, we will continue to pioneer a fundamentally different approach in the Medicare Advantage and Medicare space – investing in technology and partnering closely with physicians to help them make critical decisions for their patients at the point of care – with an overarching commitment to

creating value for all stakeholders."

48.    The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  As discussed herein, the Company misled investors by misrepresenting and/or failing to disclose that: (i) the Company was the recipient of a Civil Investigative Demand from the DOJ; (ii) much of the Company's sales are driven by a major related party deal that Clover not only failed to disclose but took active steps to conceal; (iii) the Company's subsidiary Seek Insurance failed to disclose its relationship with Clover and misled consumers as to its purported independence; (iv) the Company's software was in fact rudimentary; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

49.    On February 4, 2021, *Hindenburg Research* published a report entitled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation."   In this report, *Hindenburg Research* "reveal[ed] how Clover Health and its Wall Street celebrity promoted, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month." *Hindenburg Research* stated that its investigation "spanned almost 4 months and has included more than a dozen interviews with former employees, competitors, and industry experts," as well as "dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials."

50.    *Hindenburg Research* continued: "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from

14

kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained." *Hindenburg Research* further wrote that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor.  Our research indicates that the investigation has merit."

51.     In its report, *Hindenburg Research* provided a link to a partially redacted version of the Civil Investigative Demand that *Hindenburg Research* had obtained.  The Civil Investigative Demand provided that the DOJ was engaged in "a False Claims Act investigation" that "generally concerns whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal agencies." Among the 12 specific topics that the DOJ sought information from Clover on where: (i) the Company's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans; (ii) the Company's activities intended to encourage providers to refuse to accept patients with non-Clover coverage; (c) the Company's payments to providers' staff and employees . . . for conveying any information relating to Clover plans to patients in providers' offices; (d) payments related to Clover Assistant; (e) the Company's patient recruitment efforts; (f) the Company's activities relating to matching patients with Medicare Advantage plans; and (g) the "Seek Medicare" online platform.

52.     *Hindenburg Research* continued that "Clover claims that its best-in-class technology fuels its sales growth. We found that much of Clover's sales are driven by a major undisclosed related party deal and misleading marketing targeting the elderly.  These practices should not come as a surprise, given that in 2016, Clover was fined for misleading marketing practices by the Centers for Medicare & Medicaid Services (CMS). The fine was issued after

Clover's repeated failure to amend misleading statements about its plan offerings. A former employee told us the fine was so small it just emboldened Clover to push the envelope further."

53.     In its report, *Hindenburg Research* further flagged Clover's "thinly-disclosed subsidiary called 'Seek Insurance.'"  *Hindenburg Research* noted that "Seek makes no mention of its relationship with Clover on its website yet misleading advertises to seniors that it offers 'independent' and 'unbiased' advice on selecting Medicare plans. [Seek] claims, 'We don't work for insurance companies. We work for you', despite literally being owned by Clover, an insurance company. [Seek's] activities are also under investigation by the DOJ."

54.     *Hindenburg Research* further noted that "[m]ultiple former employees explained that much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez. One former employee estimated Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship.  One of the former employees [interviewed by *Hindenburg Research*] explained that Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name 'for compliance purposes'.  Insurance filings confirm this. The Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement."

55.     According to *Hindenburg Research*, "[i]n a *CNBC* interview announcing the Clover transaction, Chamath proclaimed, unprompted, 'they create transparency . . . they don't motivate doctors to up code or do all kinds of things to get paid".  A former employee explained to us that the DOJ is specifically asking about upcoding, or the practice of overbilling Medicare."  Indeed, "[m]uliple former employees explained" to *Hindenburg Research* "that Clover's software is primarily a tool to help the company increase coding reimbursement."

56.     Furthermore, *Hindenburg Research* wrote that "according to doctors and former employees we interviewed," physicians use Clover's software "because Clover pays them extra to use it.  Physicians are paid $200 per visit to use the software, twice the normal reimbursement rate for a Medicare visit." Rather than being "delight[ed]" by Clover's technology, "[d]octors at key Clover providers described the software as 'embarrassingly rudimentary', 'a waste of my time' and as just another administrative hassle to deal with."

57.     *Hindenburg Research* also noted that Palihapitiya's firm, Social Capital Hedosophia Holdings, invested just $25,000 and agreed that Palihapitiya would promote the Clover Health SPAC in exchange for an eventual 20.5 million in "founders shares" (worth approximately $290 million today).

58.     On this news, shares of Clover common stock plummeted from its February 3, 2021 closing price of $13.95 per share to just $12.23 per share on February 4, 2021, representing a one day drop of approximately 12.3%.  This represents a loss of approximately $700 million in market capitalization.  Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021.

59.     On February 5, 2021, the Company issued two press releases in which it announced, *inter alia*, that : (1) that Company had received a letter from the SEC "indicating that [the SEC] is conducting an investigation and requested document and data preservation for the period from January 1, 2020, to the present, relating to certain matters that are referenced in the article; and (ii) Defendant Palihapitiya and the Company "were fully aware of the DOJ inquiry," but made the affirmative decision to not publicly disclose this information.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of

Defendants' violations of Sections 10(b) and 21D of the Exchange Act, and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

61.     Plaintiff will adequately and fairly represent the interests of Clover in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

62.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock since the date on which the Company became a stock company.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

63.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of Clover to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

64.     At the time this suit was filed, the Board was comprised of five (5) members -- Garipalli, Toy, Clinton, Turner and Shapiro.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, three (3), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

65.     The Director Defendants face a substantial likelihood of liability in this action because they caused Clover to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with Clover, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

66.     The Director Defendants either knew or should have known of the false and

misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

67.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

68.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

69.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

70.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS WERE NOT INDEPENDENT

### Defendant Garipalli

71.     Defendant Garipalli is the CEO of Clover.  Defendant Garipalli is also a Director of the Company.  Defendant Garipalli is not disinterested or independent, and therefore, is

incapable of considering demand because Garipalli (as CEO) is an employee of the Company who derives substantially all of his income from his employment with Clover, making him not independent.  As such, Garipalli could not independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would have exposed him to liability and threaten his livelihood.

72.     This lack of independence and financial benefits received by Defendant Garipalli renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.  Further, Defendant Garipalli is a defendant in the securities class action entitled *Bond v. Clover Health Investments, Corp., et al.*, Case 3:21-cv-00096 (M.D. Tenn.) ("*Bond* Securities Class Action) and Kaul v. *Clover Health Investments, Corp., et al.*, Case 3:21-cv-00101 (M.D. Tenn.) (collectively, "Securities Class Actions).

**Defendant Toy**

73.     Defendant Toy is the President of Clover.  Defendant Toy is also a Director of the Company.  Defendant Toy is not disinterested or independent, and therefore, is incapable of considering demand because Toy (as President and CTO) is an employee of the Company who derives substantially all of his income from his employment with Clover, making him not independent.  As such, Toy could not independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would have exposed him to liability and threaten his livelihood.

74.     This lack of independence and financial benefits received by Defendant Toy renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

75.     Further, Defendant Toy is a defendant in the *Bond* Securities Class Action

**Audit Committee Defendants – Garipalli, Shapiro and Turner**

76.     Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*:

- Oversee[ing] the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

- Assist[ing] the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) ***the Company's compliance with legal and regulatory requirements***, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

- Provid[ing] the Board with the results of its monitoring and recommendations derived therefrom; and

- Provid[ing] to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.  [Emphasis added].

77.     Defendants Garipalli, Shapiro and Turner breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.   Therefore, Defendants Garipalli, Shapiro and Turner face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

### (Against the Director Defendants for Violations of Sections 10(b) and 21D Of The Exchange Act)

78.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.     The Company, along with Defendants Garipalli and Toy are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Actions for these violations of law, the Company's liability will be in whole or in part due to Defendants Garipalli and Toy's willful and/or reckless violations of his obligations as an officer and director of the Company.

80.     Through their positions of control and authority as officers of the Company, Defendant Garipalli and Toy were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

81.     As such, Defendants Garipalli and Toy are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u- 4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## COUNT II

### (Against the Director Defendants for Breach of Fiduciary Duty)

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

84.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

85.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to estimate its reserves set aside for annuity and pension payments, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

87.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### (Against the Director Defendants for Waste of Corporate Assets)

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.   It resulted

in continuous, connected, and ongoing harm to the Company.

90.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

91.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

92.     Plaintiff, on behalf of Clover, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)     Awarding damages to the Company for Defendants Garipalli and Toy's violations of Sections 10(b) and 21D of the Exchange Act;

(F)     Awarding Plaintiff the costs and disbursements of this action, including attorneys',

accountants', and experts' fees; and

(G)     Awarding such other and further relief as is just and equitable.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 10, 2021

<div style="margin-left: 40%;">

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
Email: rernst@bk-legal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

</div>